OPINION *Page 2 
{¶ 1} Defendant-appellant Tywan Osborne appeals his conviction and sentence entered by the Richland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} In December of 2006, Kyle Rinehart was working as a bouncer at a bar and strip club in Shelby, Ohio known as the Triple Diamond/Girls Next Door. Appellant Tywan Osborne managed the club, along with Brandon Griffith. Kyle Rinehart's girlfriend, Ashley Pfeifer, also worked at the club as a DJ. Brittini Hart worked at the club as a bartender.
 {¶ 3} On the evening of December 23, 2006, Rinehart's friend Derek White came to the club to see about getting a job as a bouncer. After the club closed in the early morning hours of December 24, 2006, Rinehart and White stayed with Ashley Pfeifer and Brittini Hart to socialize with Appellant and Griffith. Two dancers, Amy Reynolds and Shanna Clay, also stayed after closing.
 {¶ 4} At some point, Griffith became very upset, and punched Derek White multiple times in the face. When Kyle Rinehart attempted to intervene, Appellant allegedly pulled out a gun and told him to sit down and stay out of the dispute. After Rinehart refused, Rinehart alleges Appellant hit him in the face.
 {¶ 5} Rinehart testified at trial Appellant pointed a 9mm pistol at the victims, demanding they hand over all of their money. He then instructed one of the girls to go upstairs to get another handgun, and a Tech-9 machine gun. The guns were then brandished by Appellant and Shanna Clay. *Page 3 
 {¶ 6} Both Rinehart and White testified Appellant and Griffith continued to beat them over a substantial period of time, punching, kicking, whipping with a belt and hitting them with a chain. Both Rinehart and White were forced to strip naked, and had buckets of ice water poured over them and a large commercial fan turned on them. As a result of the incident, Rinehart suffered a broken jaw and White suffered a broken nose. Both suffered multiple contusions and their heads were swollen to the point of non-recognition.
 {¶ 7} At some point during the incident, Rinehart testified Appellant pointed a 9mm pistol at the victims, demanding they hand over all of their money. Rinehart testified he gave Appellant $300.00, and White gave him approximately $800.00. Hart and Pfeifer each testified they gave him the money they earned as amateur dancers at the club that night.
 {¶ 8} In the early morning hours of December 24, 2006, Appellant telephoned Robert "Ed" Perry. Following the telephone conversation, Appellant left the club and drove to Perry's house. He then followed Perry back to the club, communicating with him via cell phone. Appellant told Perry to make the problem disappear. Perry asked Appellant to blindfold the victims, so they could not identify him. Perry took the victims out of the club, but later removed the blindfolds, recognizing Rinehart as his son's good friend. Perry took the four victims to his house, cleaned them up, and took them home.
 {¶ 9} As a result, Appellant was indicted by the Richland County Grand Jury on one count of conspiracy to commit murder, with a firearm specification; four counts of felonious assault, with firearm specifications attached to two counts; eight counts of *Page 4 
kidnapping, with firearm specifications; four counts of aggravated robbery, with firearm specifications; and four counts of attempted murder, with firearm specifications.
 {¶ 10} Following a bench trial, the trial court, via Judgment Entry, found Appellant guilty of conspiracy to commit murder, four counts of kidnapping with the attached firearm specifications, and four counts of aggravated robbery with the attached firearm specifications.
 {¶ 11} On May 16, 2007, the trial court sentenced Appellant to five years for conspiracy to commit murder; five years on four counts of kidnapping, to be served concurrently, but consecutive to the conspiracy to commit murder; five years on each of the four aggravated robbery charges, to be served concurrent, but consecutive to the kidnapping and conspiracy to commit murder charges; three years for the gun specifications in all the kidnapping counts to be served concurrent to each other. On the gun specification on the aggravated robbery charges, Appellant was sentenced to three years on four counts thereof, to run concurrently, but consecutive to the gun specification on the kidnapping.
 {¶ 12} The trial court memorialized its findings and sentence via separate Judgment Entries of May 21, 2007.
 {¶ 13} Appellant now appeals, assigning as error:
 {¶ 14} "I. THE COUNSEL ERRED TO DEFENDANTS PREJUDICE IN FAILING TO PROVIDE A JURY TRIAL.
 {¶ 15} "II. THE VERDICT OF CONSPIRACY TO COMMIT MURDER WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE. *Page 5 
 {¶ 16} "III. THE COURT ERRED TO DEFENDANTS PREJUDICE BY SENTENCING DEFENDANT/APPELLANT TO MORE THAN ONE GUN SPECIFICATION.
 {¶ 17} "IV. THE COURT ERRED TO DEFENDANTS PREJUDICE BY SENTENCING DEFENDANT/APPELLANT TO SEPARATE SENTENCES FOR KIDNAPPING AND ROBBERY.
 {¶ 18} "V. TRIAL COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE SIXTH AMENDMENT FOR FAILURE TO OBJECT TO THE TRIAL COURT'S SENTENCING ON THE ALLIED OFFENSES OF SIMILAR IMPORT AND CONSECUTIVE SENTENCES FOR THE GUN SPECIFICATIONS.
 {¶ 19} "VI. DEFENDANT/APPELLANT'S CONVICTION OF ROBBERY WAS AGAINST THE WEIGHT OF THE EVIDENCE."
 I {¶ 20} In the first assignment of error, Appellant argues his conviction for conspiracy to commit murder is against the manifest weight and sufficiency of the evidence.
 {¶ 21} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N .E.2d492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the *Page 6 
prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 22} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 678 N.E.2d 541, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 23} Appellant was charged with conspiracy to commit murder, in violation of R.C. 2923.01(A)(1):
 {¶ 24} "(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, kidnapping, compelling prostitution, promoting prostitution, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, engaging in a pattern of corrupt activity, corrupting another with drugs, a felony drug trafficking, manufacturing, processing, or possession offense, theft of drugs, or illegal processing of drug documents, the commission of a felony offense of unauthorized use of a vehicle, illegally transmitting multiple *Page 7 
commercial electronic mail messages or unauthorized access of a computer in violation of section 2923.421 of the Revised Code, or the commission of a violation of any provision of Chapter 3734. of the Revised Code, other than section 3734.18 of the Revised Code, that relates to hazardous wastes, shall do either of the following:
 {¶ 25} "(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;"
 {¶ 26} Appellant argues a reasonable mind could conclude he knew of Ed Perry's relationship with Kyle Rinehart and the other victims and he could trust Perry to keep them from going to the authorities, which is why he called him. Appellant further cites Brittany Hart's testimony Appellant told them if they didn't go back to work he would kill them and their families. Appellant asserts he called Perry to keep the victims from contacting the police, as an alternative to killing them. Accordingly, Appellant asserts, there is no evidence of a conspiracy to commit murder.
 {¶ 27} Upon review of the record, Robert "Ed" Perry testified at trial he knew Appellant and Griffith for about six months, because he bought crack cocaine from them. He testified he knew Kyle Rinehart, because he and his son were good friends. Perry testified he heard Appellant talking about shooting and killing people, "gang stuff," prior to December 24, 2006. He responded to Appellant, "Man, we don't talk about that stuff around here, we just do it."
 {¶ 28} Perry testified at trial concerning the incident at issue:
 {¶ 29} "A. Tywan called and woke me up, I don't know, 3:00 or 4:00 in the morning, 5:00 in the morning. I'm not even real sure what time. I didn't look at the clock.
 {¶ 30} "Q. Did you recognize the voice as that of Tywan Osborne? *Page 8 
 {¶ 31} "A. Oh, yes.
 {¶ 32} "Q. What did he say to you?
 {¶ 33} "A. He just said he needed me to come to the club. Something about a couple guys messed him over and he wanted some help or something. He wouldn't give me no details. I said, Well, come pick me up, I don't think I got a ride. So he started on his way and I called him back. I got my ride. He was already pulling in the driveway. He said, Well, I'll just follow you. I followed him into the club.
 {¶ 34} "Q. Up to that point, did he tell you what he needed you for or what was going on?
 {¶ 35} "A. I had no idea what was going on.
 {¶ 36} "Q. Did you talk to him anymore on the way there?
 {¶ 37} "A. Yeah. We got on the cell phone. The only thing I really remember him saying is, Don't be shocked by what you're going to see. I said, What am I walking into here? He said, A couple guys tied up. I said, Tied up? I said, Man, I don't want these people to know who I am. So I guess at that point he called his buddy and told him to blindfold them.
 {¶ 38} "Q. So you could go in and not be seen.
 {¶ 39} "A. Yeah. See what's going on.
 {¶ 40} "Q. Did you — at that point did you still have any idea what was expected of you?
 {¶ 41} "A. No. No, sir.
 {¶ 42} "Q. All right. What happened when you got there and parked your cars? *Page 9 
 {¶ 43} "A. Well, we walked in, and when I walked in, I looked across the room and I could see Derek and Kyle. They were tied up, blindfolded, and bloody from head to toe, naked. The scene like I have never, ever could imagine in my life. It was just unimaginable.
 {¶ 44} "Q. What was unimaginable?
 {¶ 45} "A. Derek, I just — I've known this kid since he was seven, ten years old, or whatever.
 {¶ 46} "Q. Derek or Kyle?
 {¶ 47} "A. Kyle. I just spoke to him maybe six, eight hours before this. And I didn't recognize him. His head was as big as a basketball. I had no idea who these people were, but I was going to get them out of there. That's all — that's all I knew. I didn't know who they was at that point in time.
 {¶ 48} "Q. Just two naked boys tied up and beaten up and blindfolded.
 {¶ 49} "A. Yes, sir.
 {¶ 50} "Q. Now, what, if anything, did you decide to do when you walked in and saw that?
 {¶ 51} "A. I was going to get them out of there, whoever they was.
 {¶ 52} "Q. Did you form any kind of plan on how you were going to get them out there?
 {¶ 53} "A. I just started talking shit.
 {¶ 54} "Q. What do you mean by that?
 {¶ 55} "A. Well, when we first got there, he started — you know, we was standing, like, when you first walk in there. He said, Man, the only way to take care of it, to clean *Page 10 
this up is to take these guys out. That's when I was, like, Oh, you talking about killing these people? That's when I started talking crazy, Let me take care of this, let me do this, I'll take care of this.
 {¶ 56} "Q. So were you offering-
 {¶ 57} "A. Get these guys out of here.
 {¶ 58} "Q. Were you offering to take them out and kill them?
 {¶ 59} "A. I wasn't seriously taking them out and killing them. I wanted to get them out of there.
 {¶ 60} "Q. What was their reaction for you to do that?
 {¶ 61} "A. For somebody to do their dirty work, it wasn't hard to convince them. I was straight and sober as can be. They was buzzing. It wasn't hard to convince them.
 {¶ 62} "Q. How was Brandon Griffith acting?
 {¶ 63} "A. Brandon was really wild. He was — he was really out of control.
 {¶ 64} "Q. What was he doing?
 {¶ 65} "A. Running around beating on them, you know, just acting crazy, just completely out of hand. Tywan was more together.
 {¶ 66} "Q. I was going to say, how was Tywan acting?
 {¶ 67} "A. He was more together.
 {¶ 68} "Q. Okay. What was he saying or doing?
 {¶ 69} "A. He just wanted the problem to go away. He knew he took it too far.
 {¶ 70} "Q. Did there come a point in time when Tywan Osborne either agreed or rejected the idea of taking them out and killing them and getting rid of them?
 {¶ 71} "A. He was all for that. Whatever it took so he wouldn't get in no trouble. *Page 11 
 {¶ 72} "Q. What did you do then?
 {¶ 73} "A. Just started talking, you know, like hey, you know, I'll take care of this, let me handle this. I used to hunt around here, you know, I know places we could bury these kids and nobody would ever see them again, you'll never hear about them again, stuff like that. Just talking, anything I could say to get them kids in my hands.
 {¶ 74} "Q. What, if anything, did you do when Brandon was still beating on them?
 {¶ 75} "A. Well, I jumped between them and acted like I — you know, I grabbed Derek when he was beating Derek with the chain. I got in between them and grabbed Derek by the shirt and said, Hey punk, you know what you're going to get, you're going to get more of this, you know, just to stop the beating.
 {¶ 76} "Q. So you're acting like you're going to-
 {¶ 77} "A. Yeah. I'm acting like I'm with these guys. But the kids knew better.
 {¶ 78} "Q. What happened then?
 {¶ 79} "A. We just — I was just there a matter of minutes. I wasn't there over ten minutes probably. They agreed to let me have them kids. As soon as I got out the door, Come on, get in the fucking car, let's go, let's get out of here. I took them straight to my house, cleaned them up, gave them all the money I had.
 {¶ 80} "Q. Slow down. You're getting way ahead of me. How did you get them out the door?
 {¶ 81} "A. I convinced these guys to let me have them and got them out.
 {¶ 82} "Q. Did you see any guns?
 {¶ 83} "A. Oh, heck yeah. There was guns and blood everywhere. *Page 12 
 {¶ 84} "Q. Let's talk about the guns. Was anybody what you would consider to be under the point of a gun or at gunpoint?
 {¶ 85} "A. Well, at that time there was some girl, I'm not sure of the girl, I never met this girl. But she was standing at the end of the stage with a gun pointed at Derek and the girl, Derek and Kyle. It seemed like the girls had a gun on them, too, back over by the VIP room.
 {¶ 86} "Q. Gun on them as in holding a gun or gun on them as in pointed at them?
 {¶ 87} "A. Gun pointed at them.
 {¶ 88} "Q. Okay. And as you went out the door, were they under gunpoint?
 {¶ 89} "A. Yeah. Yes, they was.
 {¶ 90} "Q. All right. When you-
 {¶ 91} "A. That's when that big Tec 9 was — I believe was being held.
 {¶ 92} "Q. Do you recall which one of them was holding that big Tec 9?
 {¶ 93} "A. I believe it was Tywan.
 {¶ 94} "Q. Okay. What did you do when you got them out to the car?
 {¶ 95} "A. I said, Come on, let's go, let's go, let's go, get in here. You know, they didn't try to run or escape or anything between the building and the car. I guess because they knew there was a gun on them, maybe, and they knew they was with me too. Because during the parking lot I was tapping them, elbowing them, Come on, get in the car, get out of here, you know. I got them in the car and we went straight to my house.
 {¶ 96} "Q. What did you do when you got them to your house? *Page 13 
 {¶ 97} "A. Cleaned them up, bandaged them up. Like I said, I give them everything I could give them. Then I went back to the club and tried to retrieve their goods. I can't remember exactly what I retrieved. I retrieved a few items and brought it to them.
 {¶ 98} "Q. How long after you — did you ever hear from Tywan Osborne or Brandon Griffith after you left there?
 {¶ 99} "A. Yeah. I heard from Tywan. He called and asked if I had taken care of it. I said, Don't worry about it. I said, You'll never hear from the kids, they'll never say nothing. That first phone call I don't think he knew exactly what I'd done. He probably assumed I probably took them out. I don't know.
 {¶ 100} "Q. Okay. But you were vague with him about what you'd done or hadn't done?
 {¶ 101} "A. I wasn't very specific with him.
 {¶ 102} "Q. Okay. So in other words, you didn't tell him I killed them and you didn't tell him I didn't kill them.
 {¶ 103} "A. Nope. I didn't tell him either way at first.
 {¶ 104} "Q. All right. And did you have any other conversations with him?
 {¶ 105} "A. Yeah. After that, you know-
 {¶ 106} "Q. Back up. I'm sorry. When you had that first conversation with him, don't worry, I took care of it, you'll never hear from him again, et cetera, what was his reaction?
 {¶ 107} "A. Are you sure, you know? You're positive of this? Yeah. You'll not hear from them. *Page 14 
 {¶ 108} "Q. Okay.
 {¶ 109} "A. Then the next day I called — he called and, you know, I told him, you know, I didn't do nothing to them, they're fine, you know, they'll be all right, but they're not going to talk, they're not going to go to the police, and so forth.
 {¶ 110} "Q. How did you explain that they're not going to go to the police?
 {¶ 111} "A. I just told him to trust me.
 {¶ 112} "Q. Did you hear any more from him after that?
 {¶ 113} "A. I kept in contact with him trying to figure out what to do about all this, you know. Because I knew something had to be done, you know, one way or another.
 {¶ 114} "Q. What other kind of contact did you have with him?
 {¶ 115} "A. Well, he come around saying that this had to be cleaned up. There was only one way to do it, we gotta take these people out. He was wanting these people killed. And that wasn't going to happen.
 {¶ 116} "Q. Well, how did you handle that?
 {¶ 117} "A. I didn't. I just blew it off.
 {¶ 118} "Q. Okay. I mean, did you say, No, we don't need to kill them, or did you say, Okay, I'll kill them?
 {¶ 119} "A. Oh, no, I didn't say I'd kill them. No, we don't need to kill them. They're not going to say nothing, don't worry about it. That's all I kept saying to him.
 {¶ 120} "Q. Was he ever satisfied with that?
 {¶ 121} "A. He seemed to be. He got to where he was satisfied finally with that. He let it be. *Page 15 
 {¶ 122} "Q. All right. When you left the bar that night, what was your understanding as to what you were supposed to do with these four kids?
 {¶ 123} "A. According to them, they thought I was going to kill them, I guess.
 {¶ 124} "Q. Okay."
 {¶ 125} Tr. at 490-498
 {¶ 126} Kyle Rinehart also testified at trial:
 {¶ 127} "Q. Okay. If you can describe what the events were surrounding getting blindfolded, who was doing what, what was happening?
 {¶ 128} "A. Before we got blindfolded Tywan made a phone call and said that we was going to be getting taken care of.
 {¶ 129} "Q. How did you take that?
 {¶ 130} "A. Like I thought I was going to die."
 {¶ 131} Tr. at 51
 {¶ 132} Derek White also testified concerning the circumstances relative to Mr. Perry:
 {¶ 133} "A. Just started — they were flipping out trying to get somebody to take us or somebody to kill us. They were talking about killing us.
 {¶ 134} "Q. Who is they?
 {¶ 135} "A. Tywan and Brandon.
 {¶ 136} "Q. Do you know what transpired, what happened?
 {¶ 137} "A. They blindfolded us once and told us they were going to take us out in the car, put us in the trunk.
 {¶ 138} "Q. Who is telling you that? *Page 16 
 {¶ 139} "A. Tywan. At that time I was blindfolded. I'm pretty sure it was Tywan. They were discussing it, him and Brandon.
 {¶ 140} "Q. Okay. Now, again, pursuant to those comments and those discussions, what, if anything, happened?
 {¶ 141} "A. I don't know. At that time I was scared. I don't know.
 {¶ 142} "Q. Well, I guess really that's just my fancy way of saying what happened next?
 {¶ 143} "A. Well, they unblindfolded us, again, and just kept taunting us and stuff.
 {¶ 144} "Q. Okay. Keep going, tell me what happened next?
 {¶ 145} "A. Then they blindfolded us, again. Then they had somebody on the phone. I didn't know who it was at the time.
 {¶ 146} "Q. Now, let me ask you a question. What did they blindfold you with?
 {¶ 147} "A. Them white shirts.
 {¶ 148} "Q. Those bloody white T-shirts?
 {¶ 149} "A. Yes, sir.
 {¶ 150} "Q. Who is they, when you say they got somebody on the phone?
 {¶ 151} "A. Tywan is the one that had the phone. So Tywan got Ed on the phone.
 {¶ 152} "Q. Okay. Did you know it was Ed at the time?
 {¶ 153} "A. No, sir.
 {¶ 154} "Q. Okay. What happened then?
 {¶ 155} "A. Then just he blindfolded us, again. Right before Ed got there and then Ed come in they took our blindfold off. Let us put our clothes back on and stuff and on the way to the back, they put us in this little room back there. They were discussing *Page 17 
something with Ed and that's when Brandon come in and hit me in the back with the chain an wrapped it around my neck on the way out of the room and from there Tywan come over and stopped Brandon from beating me with the chain and stuff and pushed me out the door with that machine gun. Then from there we got in Ed's car and went to his house.
 {¶ 156} "Q. Did you know Ed?
 {¶ 157} "A. No, not that well at the time.
 {¶ 158} "Q. Did you, what were you thinking Ed was going to do?
 {¶ 159} "A. Well, when I first went out to the car Kyle got right in. I was like, "We've got to get out of here. They are going to kill us. They are going to kill us." Kyle is like, "It is all right. It is Isaac Perry's dad." And I knew Isaac.
 {¶ 160} "Q. That left you to know —
 {¶ 161} "A. I knew I was all right then. So I got in the car."
 {¶ 162} Tr. at 211-214
 {¶ 163} In light of the testimony cited above, there was competent, credible evidence to support Appellant's conviction for conspiracy to commit murder. Appellant's first assignment of error is overruled.
 II {¶ 164} In the second assignment of error, Appellant argues his conviction for kidnapping was not supported by the evidence.
 {¶ 165} We review this assignment of error pursuant to the standard set forth in the analysis of Appellant's first assignment of error. *Page 18 
 {¶ 166} Appellant was charged with kidnapping, in violation of R.C.2905.01, which reads:
 {¶ 167} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 168} "(1) To hold for ransom, or as a shield or hostage;
 {¶ 169} "(2) To facilitate the commission of any felony or flight thereafter;
 {¶ 170} "(3) To terrorize, or to inflict serious physical harm on the victim or another;"
 {¶ 171} Appellant cites the testimony of Ashley Pfeifer and Brittany Hart stating the incident continued for at least an hour before any guns were brought out. Appellant argues his conviction is against the manifest weight and sufficiency of the evidence because the victims were not moved to any other place, and they were there voluntarily as it was normal for them to stay after hours. Appellant argues Rinehart and White took off their clothes without guns being pointed at them. Appellant further asserts the victims did not attempt to leave during the incident before the guns were brandished.
 {¶ 172} Upon review of the record, the testimony presented at trial, as noted supra, clearly establishes the victims were restrained of their liberty for several hours due to Appellant's beating them and holding them at gun point, in order to facilitate the commission of the offense of aggravated robbery.
 {¶ 173} Accordingly, Appellant's second assignment of error is overruled. *Page 19 
 III. {¶ 174} In the third assignment of error, Appellant argues the trial court erred in sentencing him on more than one gun specification. Specifically, appellant argues the trial court erred in imposing one three-year gun specification in connection with the kidnapping convictions, and one three-year gun specification in connection with the aggravated robbery convictions, to run consecutive to each other. Appellant argues the kidnapping and aggravated robbery convictions to which the gun specifications relate constituted one transaction or occurrence; therefore, the trial court could only sentence on one gun specification.
 {¶ 175} The State concedes the trial court erred in imposing a sentence on both of the firearm specifications, citing R.C.2929.14(D)(1)(b). The statute provides, "[a] court shall not impose more than one prison term on an offender under division (D)(1)(a) of this section for felonies committed as part of the same act or transaction."
 {¶ 176} Accordingly, as both parties concede the trial court could only sentence Appellant to one three-year consecutive term for the firearm specifications, Appellant's multiple sentences on the firearm specifications are vacated, and the matter remanded to the trial court to resentence in accordance with the law and this opinion.
 IV. {¶ 177} In the fourth assignment of error, Appellant argues the trial court erred in sentencing Appellant to separate sentences on the kidnapping and aggravated robbery charges. Specifically, Appellant asserts the charges constitute allied offenses of similar import, pursuant to R.C. 2941.25(A). The statute reads: *Page 20 
 {¶ 178} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."
 {¶ 179} In State v. Ranee (1999), 85 Ohio St.3d 632, the Ohio Supreme Court set forth the test to consider regarding this issue:
 {¶ 180} "The applicable test for deciding that issue is as follows: If the elements of the crimes" `correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import.'" Id. at 13, 676 N.E.2d at 81, quoting Blankenship, 38 Ohio St.3d at 117, 526 N.E.2d at 817. If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends-the multiple convictions are permitted. R.C.2941.25(B). See, also, State v. Mughni (1987), 33 Ohio St.3d 65, 68,514 N.E.2d 870, 873."
 {¶ 181} The elements of the offenses are to be compared in the abstract.
 {¶ 182} In the case sub judice, the elements of kidnapping, as defined in R.C.2905.01(A)(2), include:
 {¶ 183} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 184} "(2) To facilitate the commission of any felony or flight thereafter"
 {¶ 185} The elements of aggravated robbery, as defined in R.C.2911.01(A)(1), include: *Page 21 
 {¶ 186} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 187} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;"
 {¶ 188} Upon review of the above, a comparison of the statutes indicates the elements do not correspond to such a degree the commission of one would result in the commission of the other. Based upon the above, kidnapping and aggravated robbery are not allied offenses of similar import, and the trial court did not err in sentencing Appellant accordingly.
 {¶ 189} Appellant's fourth assignment of error is overruled.
 V. {¶ 190} In the fifth assignment of error, Appellant argues his trial counsel was ineffective in failing to object to the trial court's sentencing him separately on the kidnapping and aggravated robbery charges and the imposition of consecutive sentences for the gun specification.
 {¶ 191} The standard of review of an ineffective assistance of counsel claim is well established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, *Page 22 
in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373.
 {¶ 192} First, we must determine whether counsel's assistance was ineffective, i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client.
 {¶ 193} If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. As stated above, this requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v.Sallie (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267.
 {¶ 194} Based upon our analysis and disposition of Appellant's fourth assignment of error, Appellant's counsel was not ineffective in failing to object to the trial court's sentencing of Appellant on both the kidnapping and aggravated robbery charges, as the same are not allied offenses of similar import.
 {¶ 195} Further, based upon our analysis and disposition of Appellant's third assignment of error, we find Appellant's argument his counsel was ineffective in failing to object to the trial court's sentencing on the gun specifications is moot.
 {¶ 196} Accordingly, Appellant's fifth assignment of error is overruled.
 VI. {¶ 197} In the sixth assignment of error, Appellant argues his conviction for aggravated robbery is against the manifest weight and sufficiency of the evidence. *Page 23 
 {¶ 198} Again, an appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks(1981), 61 Ohio St.3d 259, 574 N .E.2d 492.
 {¶ 199} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.
 {¶ 200} Appellant was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(1):
 {¶ 201} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 202} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;"
 {¶ 203} In his argument, Appellant again argues the conduct for which he was convicted of aggravated robbery also constituted the allied offense of kidnapping. *Page 24 
Further, Appellant cites the testimony of Ashley Pfeifer stating she did not think Appellant had anything to do with the robbery.
 {¶ 204} Upon our review of the record, Kyle Rinehart, Derek White and Brittani Hart all testified Appellant was the individual pointing the gun at them and demanding all of their money during the altercation. Accordingly, there was competent, credible evidence to support Appellant's conviction for aggravated robbery.
 {¶ 205} Further, as discussed in our analysis and disposition of the fourth assignment of error, Appellant's aggravated robbery convictions were not allied offenses of similar import to the kidnapping convictions.
 {¶ 206} Accordingly, the sixth assignment of error is overruled.
 {¶ 207} Appellant's conviction in the Richland County Court of Common is affirmed, but his sentence is vacated, in part, and remanded for further proceedings in accordance with the law and this opinion.
 Hoffman, P.J. Farmer, J. and Delaney, J. concur *Page 25 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, Appellant's conviction in the Richland County Court of Common is affirmed, but his sentence is vacated, in part, and this cause remanded to the trial court for resentencing in accordance with the law and our opinion. Costs assessed to Appellant. *Page 1